IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | : | |
|---|---|---|
| **WILLIAM RIVERA,** | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | No. 22-3902 |
| | : | |
| **GEORGE LITTLE, et al.,** | : | |
| Defendants. | : | |

# ORDER

**AND NOW**, this 21st day of March, 2023, upon review of the various motions filed in the above-captioned docket, it is hereby **ORDERED** as follows:

1. Plaintiff William Rivera's Motion to Correct Paragraph 26 of the Civil Complaint (ECF No. 18) is **GRANTED**.

2. Defendants George Little, Jaime Sorber, R. Terra, and J. Terra's Motion to Dismiss (ECF No. 19) is **GRANTED**; **THIS ACTION IS DISMISSED WITH PREJUDICE, WITHOUT LEAVE TO AMEND.** [1]

3. Plaintiff William Rivera's Emergency Motion for Immediate Order for Permanent Preliminary Injunction (ECF No. 6) is **DENIED**. [2]

4. Plaintiff William Rivera's Motion for Court Intervention (ECF No. 20) is **DENIED** as **MOOT**. [3]

5. Plaintiff William Rivera's Motion for Extension of Time to File Response to Defendants' Motion to Dismiss (ECF No. 22) is **DENIED** as **MOOT**. [4]

The Clerk of Court is **DIRECTED** to mark this matter **CLOSED**.

**IT IS SO ORDERED.**

BY THE COURT:

*/s/ John Milton Younge*
**JUDGE JOHN MILTON YOUNGE**

1

[1] **FACTUAL BACKGROUND/PROCEDURAL HISTORY:**

For purposes of this section, this Court will rely on the factual background and procedural history provided by Chief United States Magistrate Judge Karoline Mehalchick for the Middle District of Pennsylvania in her Report and Recommendation in a related proceeding:

> On January 25, 2018, Plaintiffs filed suit on behalf of a class of death-sentenced prisoners confined in one of the Capital Case Units (the "CCU") of Pennsylvania's Department of Corrections ("DOC") [*Reid, et al. v. Wetzel, et al.*]. On April 3, 2018, the Court certified the Plaintiff class as a class action on behalf of "all current and future death-sentenced prisoners in the Commonwealth of Pennsylvania," with Plaintiffs serving as Class Representatives. Following class certification and extensive discovery, the parties began settlement negotiations, which culminated in a settlement agreement dated November 12, 2019 (the "Agreement") [or "Settlement Agreement"].
>
> According to the Agreement, the CCU will no longer be classified as a "Level 5" housing unit requiring enhanced security protocols, and will instead be operated as a general population unit of exclusively death-sentenced prisoners. CCU inmates will no longer be strip-searched, shackled, tethered, or physically restrained when moving about their own prison unit, nor will they be marked by different colored clothing. They will be permitted to obtain jobs both on the unit and at least some off-unit placements; have access to congregate religious activities; and be offered at least 42.5 hours of out-of-cell time per week and allowed contact visits lasting at least one hour. DOC's compliance with the Agreement's terms will be monitored by an independent Technical Compliance Consultant for the duration of the Agreement. Finally, and as is fairly customary in amicable settlements of this sort, no party admits wrongdoing.
>
> The Court preliminarily approved the Agreement on November 20, 2019, and ordered notice be provided to the class….On April 9, 2020, the Court granted the joint motion for final approval of the class action Agreement pursuant to Fed. R. Civ. P. 23.2. The Court expressly retained jurisdiction throughout the duration of the Agreement.
>
> On October 12, 2021, Plaintiff Rivera filed the motion to enforce settlement. The motion for enforcement of settlement has been fully briefed and is ripe for disposition.

(R&R, pp. 2-3, ECF No. 182, docket: 18-cv-176-CCC, M.D. Pa.) (citations omitted).

Chief United States Magistrate Judge Mehalchick also concluded the following with respect to the terms of the Settlement Agreement:

> The undersigned finds that Rivera has mischaracterized the Agreement by claiming that it specifically prohibits the type of housing conditions he experienced while on AC [administrative custody or more restrictive custody] status. The Agreement generally provides that the CCU shall be operated as a general population unit that does not require enhanced security protocols. The Agreement also indicates that the CCU shall not employ housing procedures similar to AC status as contained in DC-ADM 802. Rivera suggests that the Agreement prohibits capital prisoners from confinement in AC status, as he was so confined after the misconduct hearing held on March 19, 2021. However, the Agreement only reflects that the CCU cannot operate as an AC status unit. The Agreement does not prohibit housing individual capital prisoners elsewhere in AC status when warranted by the circumstances.

\*\*\*

> Giving due regard to prison internal order and security considerations, and the terms of the Agreement, the undersigned finds that Defendants have not violated the Agreement by housing Rivera in AC status, which was warranted, after he was found guilty of a misconduct charging him with an assault of a staff member.
>
> Accordingly, it is recommended that Rivera's motion to enforce settlement be denied as he has not identified a provision of the Agreement that has been violated nor has he established that the Agreement provides for the type of housing conditions he demands or prohibits the type of housing conditions he claims to have experienced.

(R&R, pp. 10-12. ECF No. 182, docket: 18-cv-176-CCC, M.D. Pa.) (citations omitted).

On August 5, 2022, Chief United States Magistrate Judge Mehalchick filed the aforementioned Report and Recommendation. On September 6, 2022, United States District Court Judge Christopher C. Conner for the Middle District of Pennsylvania adopted the Report and Recommendation. (ECF No. 183, docket: 18-cv-176-CCC, M.D. Pa.) Just a few weeks later, on September 29, 2022, Plaintiff Rivera filed this instant action before this Court—wherein he asserts eight (8) claims against Defendants for failure to get a court order before taking further actions, like removing him from CCU housing (Counts I-V), and for denial of certain privileges in violation of his Eighth and Fourteenth Amendment rights (Counts VI-VIII). (Compl., pp. 16-18, ECF No. 1.) On January 23, 2023, Defendants filed a motion to dismiss—alleging that Plaintiff's claims are barred by collateral estoppel as they mirror the claims made in the Middle District of Pennsylvania's *Reid* proceedings and by qualified immunity with respect to the state law tort claims asserted against Defendants/prison officials. (Def. Mot. to Dismiss, ECF No. 19.)

**LEGAL STANDARD:**
The standard for a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) is examined in detail in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). After *Iqbal*, it is clear that "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to defeat a Rule 12(b)(6) motion to dismiss. *Id.* at 678; *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "To survive dismissal, 'a complaint must contain sufficient factual matter, accepted as true, to state a claim [for] relief that is plausible on its face.'" *Tatis v. Allied Interstate*, LLC, 882 F.3d 422, 426 (3d Cir. 2018) (quoting *Iqbal*, 556 U.S. at 678). Facial plausibility is "more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Iqbal*, 556 U.S. at 678). Instead, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Iqbal*, 556 U.S. at 678).

**DISCUSSION:**
As previously noted, Defendants argue that Plaintiff's claims are either barred by collateral estoppel or by qualified immunity. This Court will review both arguments in turn.

**Counts I-VII: Collateral Estoppel:**
In this case, Counts I-V allude to Defendants removing Plaintiff from CCU status and housing "without any court order vacating and setting aside the Plaintiff's [CCU designation or status]." (Compl., pp. 16-17, ECF No. 1.) When referencing the need for a court order, Plaintiff appears to be referring to the terms of the Settlement Agreement from the Middle District's *Reid* proceeding. As Plaintiff notes elsewhere in his Complaint, "Defendant[s] could not remove Plaintiff from the Capital Cause Unit and designate…Plaintiff to a non-Capital Case Unit without a proper court order" seemingly because the *Reid* Settlement Agreement represented a "sea change" in the conditions of confinement for death-sentenced inmates (like Plaintiff) who now would be exclusively housed in the CCU. (Compl., p. 13, ECF No. 1.) Thus, Defendants allegedly

3

violated Plaintiff's rights by not returning him to CCU housing following his disciplinary time served in restricted housing in connection with Plaintiff's assault of a prison staff member. Similarly, Counts VI-VIII allude to the "privileges that [were] earned in the Settlement Agreement of *Reid v. Wetzel*." (Compl., p. 15, ECF No. 1.) However, Plaintiff seems to—once again—mischaracterize the Settlement Agreement, especially since "[t]here is no provision in the Agreement restricting prison officials from utilizing other specialized housing units for capital prisoners where particular incidents or situations warrant such placement decisions" and "[t]here is nothing in the record to support the contention that the parties intended Defendants to provide a prisoner with a 'TV, table, typewriter, art supplies, [etc.],' while confined in AC status or while serving a disciplinary sanction." (R&R, pp. 10-12. ECF No. 182, docket: 18-cv-176-CCC, M.D. Pa.) Stated differently, Defendants could place Plaintiff in non-CCU housing without the need for a court order and without the privileges of CCU-housing and, in doing so, would not violate the terms of the *Reid* Settlement Agreement.

The *Reid* Settlement Agreement is important and relevant here—as any attempts by Plaintiff to re-litigate the issue of being placed in non-CCU housing are barred by the doctrine of collateral estoppel. As the Third Circuit instructs, "[u]nder the doctrine of collateral estoppel, 'once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation.'" *Howard Hess Dental Lab'ys Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 247 (3d Cir. 2010) (quoting *Montana v. United States*, 440 U.S. 147, 153 (1979)). Further, for the doctrine to apply, the following four elements must be satisfied: "(1) the identical issue was previously adjudicated; (2) the issue was actually litigated; (3) the previous determination was necessary to the decision; and (4) the party being precluded from relitigating the issue was fully represented in the prior action." *Id.* at 247–48 (quoting *Szehinskyj v. Atty. Gen. of U.S.*, 432 F.3d 253, 255 (3d Cir. 2005)). Here, the *Reid* Court has already addressed this very issue—whether death-sentenced inmates could be removed from CCU housing and placed in more restrictive housing—and concluded that nothing in the terms of the Settlement Agreement precluded placing death-sentenced inmates in more restrictive housing when required by the circumstances. Under element (2), according to Chief United States Magistrate Judge Mehalchick's Report and Recommendation, "[t]he motion for enforcement of settlement ha[d] been fully briefed and [was] ripe for disposition." (R&R, p. 3. ECF No. 182, docket: 18-cv-176-CCC, M.D. Pa.) Under element (3), determining the scope of the *Reid* Settlement Agreement as applied specifically to Plaintiff and other similarly situated death-sentenced inmates was the entire impetus for the Report & Recommendation. Finally, under element (4), Plaintiff had the opportunity to brief the issue and to make any relevant arguments regarding the scope and applicability of the Settlement Agreement. Thus, even though Plaintiff attempted to file a related action in this Court—just weeks after the Middle District's ruling in *Reid*—does not change the fact that Plaintiff is collaterally estopped from arguing that Defendants violated his rights by removing him from CCU housing without a court order and without providing him with certain privileges and accommodations. In addition to the doctrine of collateral estoppel, the *Reid* Court has also "expressly retained jurisdiction through the duration of the Agreement" (R&R, p. 3. ECF No. 182, docket: 18-cv-176-CCC, M.D. Pa.)—meaning that this Court declines to question the *Reid* Court's interpretation of the Settlement Agreement and that Plaintiff should file any additional grievances in connection with the Settlement Agreement with the *Reid* Court.

### **Counts VI-VIII: Qualified Immunity & Deference to Prison Officials**
With respect to Plaintiff's remaining claims, this Court also notes that Count VII's invocation of state law claims of negligence, gross negligence, and intentional infliction of psychological symptoms against Defendants are barred by qualified immunity. *See* 1 Pa.C.S.A. § 2310 ("[T]he Commonwealth, and its officials and employees acting within the scope of their duties, shall continue to enjoy sovereign immunity and official immunity and remain immune from suit except as the General Assembly shall specifically waive the immunity [none of which apply to this case].") Additionally, Counts VI-VIII's focus on

4

Defendants' decision to place Plaintiff into more restrictive custody following his assault of a prison staff member is also entitled to great weight and deference. *See Whitley v. Albers*, 475 U.S. 312, 321 (1986) ("[T]he admonition that 'a prison's internal security is peculiarly a matter normally left to the discretion of prison administrators'…carries special weight.") (citation omitted); *see also Bell v. Wolfish*, 441 U.S. 520, 521 (1979) ("Since problems that arise in the day-to-day operation of a corrections facility are not susceptible of easy solutions, prison administrators should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.")

Taken together, the *Reid* Court's interpretation of the Settlement Agreement governs this instant action through the doctrine of collateral estoppel and specifically clarified that Plaintiff could be placed in more restrictive housing without certain privileges based on his misconduct and assault of a prison staff member. Further, qualified immunity precludes any state tort law claims against Defendants, and the deference afforded to Defendants/prison officials in determining protocols for internal security, discipline, and order all work together to compel this Court to conclude that Plaintiff has not stated a claim upon which relief could be granted.

### **CONCLUSION:**
For the foregoing reasons, Defendants' Motion to Dismiss Plaintiff's Complaint is hereby granted.

### **PRECLUDING LEAVE TO AMEND COMPLAINT:**
When a motion to dismiss is granted, the court must then decide whether to grant leave to amend. The Third Circuit has a liberal policy favoring amendments and, thus, leave to amend should be freely granted. *See, e.g.*, *Oran v. Stafford*, 226 F.3d 275, 291 (3d Cir. 2000*); Dole v. Arco Chem. Co.*, 921 F.2d 484, 486 (3d Cir. 1990). However, a court need not grant leave to amend when it would be an exercise in futility. *City of Cambridge Ret. Sys. v. Altisource Asset Mgmt. Corp.*, 908 F.3d 872, 879 (3d Cir. 2018) ("Leave to amend is properly denied if amendment would be futile, *i.e.*, if the proposed complaint could not 'withstand a renewed motion to dismiss.'") (quoting *Jablonski v. Pan. Am. World Airways, Inc.*, 863 F.2d 289, 292 (3d Cir. 1988)); *see also In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1434 (3d Cir. 1997) (recognizing that denial of leave to amend is not an abuse of discretion where the pleadings before the court demonstrate that further amendment would be futile). Given this Court's determination that Plaintiff's claims are barred by either collateral estoppel or qualified immunity (along with the great deference given to prison officials' determinations with respect to internal security, discipline, and order), a leave to amend would be futile—especially since an amended complaint could not overcome the hurdles identified in this case and similarly could not withstand a renewed motion to dismiss by Defendants.

### [2] **PRELIMINARY INJUNCTION:**
In addition to filing his Complaint, Plaintiff—on September 29, 2022—also filed an Emergency Motion for Immediate Order for Permanent Preliminary Injunction. (ECF No. 6.) As the Third Circuit instructs, "[a] plaintiff seeking a preliminary injunction must establish [(1)] that he is likely to succeed on the merits, [(2)] that he is likely to suffer irreparable harm in the absence of preliminary relief, [(3)] that the balance of equities tips in his favor, and [(4)] that an injunction is in the public interest." *Milhouse v. Fasciana*, 721 F. App'x 109, 111 (3d Cir. 2018) (citation omitted). Given that this Court has just granted Defendants' Motion to Dismiss Plaintiff's Complaint, this would necessarily mean that Plaintiff is unable to prove that he is likely to succeed on the merits. Thus, this Court declines to entertain or further analyze Plaintiff's motion for a permanent preliminary injunction. *See Ferring Pharms., Inc. v. Watson Pharms., Inc.*, 765 F.3d 205, 210 (3d Cir. 2014) ("The 'failure to establish any element…renders a preliminary injunction inappropriate.'").

---

[3] **MOTION TO APPOINT COUNSEL:**
Given that this Court has dismissed Plaintiff's Complaint for failure to state a claim and that the issues involving collateral estoppel and qualified immunity are incurable deficiencies, the need for the appointment of counsel is now moot. Despite these truths, it is worth noting that this Court, on November 29, 2022, referred Plaintiff's case to the United States District Court for the Eastern District of Pennsylvania's Prisoner Civil Rights Panel—a voluntary panel of attorneys interested in providing legal representation to prison inmates for alleged constitutional violations. (ECF No. 15.) However, after almost four months, no attorney has agreed to represent Plaintiff or to take on his case.

[4] **MOTION FOR EXTENSION OF TIME TO FILE RESPONSE:**
Finally, on February 6, 2023, Plaintiff filed a Motion for Extension of Time to File Response to Defendants' Motion to Dismiss. (ECF No. 22.) However, before this Court could rule on said motion, Plaintiff—on February 9, 2023—filed his brief in opposition. Thus, Plaintiff's motion is now moot.